Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| J.S., and S.S.,<br><br>            Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH.<br><br>            Defendants. | COMPLAINT<br><br><br>Case No. 2:21-cv-00483 - DAO |

Plaintiffs J.S. and S.S., through their undersigned counsel, complain and allege against

Defendants United Healthcare Insurance Company and United Behavioral Health (collectively

"United") as follows:

**<u>PARTIES, JURISDICTION AND VENUE</u>**

1.  J.S. and S.S. are natural persons residing in Tarrant County, Texas. J.S. is S.S.'s father.

2.  United is an insurance company headquartered in Hennepin County, Minnesota and was

    the insurer and claims administrator as well as the fiduciary under ERISA for the Plan

    beginning June 1, 2019.

1

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). J.S. was a participant in the Plan and S.S. was a beneficiary of the Plan at all relevant times. J.S. and S.S. continue to be participants and beneficiaries of the Plan.

4. S.S. received medical care and treatment at Change Academy Lake of the Ozarks ("CALO") from August 10, 2018, to December 14, 2020. CALO is a licensed treatment facility located in Camden County, Missouri, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. United denied claims for payment of S.S.'s medical expenses in connection with her treatment at CALO.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions because United has a claims appeal office and does significant business in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),

an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### S.S.'s Developmental History and Medical Background

9. S.S. was removed from her biological parent's home at two and a half years of age. She was placed into the Texas foster care system for four years and had two failed adoptions before being placed with her current parents.

10. S.S.'s biological parents have a history of bipolar depression, alcoholism, and drug addiction.

11. Neither of S.S.'s biological parents had finished high school and were often unemployed. S.S. also had two biological siblings that lived with her.

12. S.S.'s biological father was in and out of jail for theft and aggravated assault. At one of his most violent times, he tried to kill S.S.'s biological mother in front of S.S. and her siblings. S.S.'s biological mother tried to commit suicide in front of S.S. and her siblings and would scream at and hit S.S. with objects.

13. S.S.'s biological parents exposed her to drugs such as marijuana at just two years of age and left her and her siblings malnourished frequently. The police were called many times in addition to Child Protective Services ("CPS") until S.S. was finally put into foster care.

14. S.S. was in the foster care system for four years and was placed in several different homes. S.S. and her siblings were generally together in foster care, but the traumatic experiences they had been subjected to caused her siblings to require residential treatment care on more than one occasion, like the treatment S.S. would later experience at CALO.

15. At two years and nine months old S.S. had a developmental evaluation which reported that she was throwing fits, self-abusive (banging her head and biting herself when she was angry), physically aggressive towards others, defiant and oppositional.

16. S.S. was abandoned by her biological parents, and two different foster homes which engrained the pattern of abandonment.

17. S.S. made threats of hurting herself and talked about seeing her biological mother cut herself at a very young age. At this time, she was diagnosed with adjustment disorder and disturbance of emotions and conduct.

18. At age four S.S. required a high level of structure and supervision. It was noted that when she gets mad, she gets destructive. She was doing well at pre-kindergarten, but her teachers noted that she was obsessed with the boys. At the same time her current foster parents noted that S.S. was being inappropriate at bath time and was being "sexy."

19. At this time, S.S. also received a diagnosis of anxiety disorder and oppositional defiant disorder. Her doctors also noted that S.S. was exposed to drugs in utero.

20. In 2009, S.S.'s biological parents lost visitation rights because it would take S.S. nearly two weeks to return back to her normal state after a visit with them. Also, at this time S.S.'s siblings were separated from her because they were both doing much worse than she was and needed additional care in a residential treatment program.

21. Also in 2009, S.S.'s adoption failed for the second time which gave her this idea that she was given back because she was not good enough and that her potential parents hated her. S.S. only spent seven weeks with this family, but as a six-year-old child it was impactful and left her with an inability to trust, gave her a high need for control and she continuously was in a fight or flight mode.

4

22. When S.S.'s current parents adopted her, she had been at twelve different homes and was only six and a half years old. S.S. immediately started calling her new parents mom and dad and told her mother that she "knew you'd be my mom."

23. S.S.'s parents noted that she immediately had issues at home and would rage for thirty minutes to over an hour sometimes when things did not go her way. Two months later her parents decided to start her in play therapy which S.S. seemed to enjoy.

24. S.S.'s parents also noticed that she had some physical developmental issues, so her parents took her to occupational therapy ("OT"). S.S. had a speech impairment, had very poor handwriting, could not jump off the ground and was very messy when she ate. S.S. received OT for eight months and benefited greatly from it.

25. In the summer of 2012, S.S. attended a two-week day program at the Cook Children's hospital. She was admitted to this program to address violence toward others, self-harm, and disruptive behaviors. She was diagnosed with a mood disorder, ADHD-CT, ODD and R/O RAD.

26. S.S. progressed through school but had so much anxiety and fear about being liked or rejection that she kept all her feelings in during school and then would come home and burst with emotions. She would call this her "home [S.S.]" and did not let anyone outside her family to see this side of her.

27. In fourth grade, S.S. stole some money of a classmate's to spend on trinkets. She ended up being caught and that was a major turning point for S.S. After that she ended up letting "home S.S." out in school much more frequently.

28. S.S.'s fourth grade teacher reported that she "has a tendency to become easily enraged." And "[S.S.] becomes very aggressive when she is angry." She also noted that when S.S.

is angry, she is very strong and exhibits violent behaviors such as throwing, kicking,
banging her head, and biting herself. Her fourth-grade teacher was very fearful for S.S.'s
safety and others. She also threatened to kill or hurt herself. Her teacher also noted that
she is a "ticking time bomb" and is "very explosive." S.S.'s teacher stated that S.S. went
into rages at school to the point where other children had to be be removed from her
presence.

29. By fifth grade, S.S. was placed in a homebound program and she and her family were
entered into a Start Over program which was specifically set up for working through
adoption trauma. The first phase of this program worked very well with S.S. as she had
one on one time with her teacher. The second phase of semi-independence was phased
into public school again for thirty-minute time periods. If S.S. completed this without
issue (no violence, aggression, screaming, destructive behavior, defiance, self-harm or
running) she would get another thirty-minute period. By the end of fifth grade, she was
back in school full time.

30. For sixth through eighth grades, S.S. was able to attend public school daily full time with
the help of an aide and an individual educational program. She struggled with making
and keeping friends and her need to have control of everything caused many strained
relationships. S.S. ended up isolating herself completely.

31. At age twelve, S.S. was hypervigilant, lying, stealing, hoarding, and running when angry.
S.S.'s parents also found out that she had gotten into some oversexualized behaviors and
materials with pornography. At school S.S. watched a series of videos on suicide and it
piqued her interest. After that S.S.'s parents started to find knives hidden around the
house. S.S. was focused on violence and sex in particular.

32. When S.S. reached high school, things reached an all-time low for her. She could not have an aide in her class, and she was allowed to go to a special educational room if needed, but it was up to her to make that decision and vocalize it in front of her new classmates and teachers.

33. S.S. was severely bullied and called a snitch. Students would tell her to kill herself because "no one wants you here" and this led S.S. to start skipping classes and turning to pills and vaping as a release. She made friends with other troubled kids. S.S.'s parents described this point in her life as falling off a cliff instead of walking up a hill.

34. In 2018, S.S. was taken to a psychiatric unit at a hospital by the high school police officers. This led S.S.'s parents to look into more intensive care programs. Although they did not want to send S.S. away due to her already strong abandonment issues, they realized that they could not help her from home and  that she needed more intense care.

35. In May of 2018, S.S. attended an outdoor behavioral health program, Anasazi Foundation ("Anasazi"). S.S. attended Anasazi for six weeks. She became more and more angry as her time at Anasazi progressed. After an episode of severe aggression, property damage, and suicidal statements, Anasazi took her to a hospital for observation. After she returned, she was not compliant with the program and Anasazi decided that she needed a higher level of care and asked her to leave the program.

36. After Anasazi, S.S. was transported to the ViewPoint Center ("ViewPoint"), a short-term residential treatment program, to determine what care S.S. could benefit from most. S.S. was at ViewPoint for seven weeks.

37. After ViewPoint, S.S. was transferred to CALO where she received care for a Mood Disorder, NOS, Oppositional Defiant Disorder, Attention-Deficit/Hyperactivity Disorder

– Combined Type, and Reactive Attachment Disorder. S.S.'s parents described CALO as "the light at the end of the tunnel." S.S. took a few months to engage with the programing at CALO but finally found how helpful CALO was to her emotional and behavioral health.

## CALO

38. S.S. was admitted to CALO on August 10, 2018.

39. J.S. and S.S. received several explanation of benefits ("EOBs") from United dated April 4, 2019, April 18, 2019, May 6, 2019, May 20, 2019, July 22, 2019, and August 26, 2019 denying S.S.'s care at CALO from January 1, 2019 through May 31, 2019.

40. United never sent J.S. or S.S. a letter with an in-depth denial rationale, but the EOBs identified several different denial codes.

41. S.S.'s care between January 1, 2019, and February 28, 2019, was denied for:

> 3M – BENEFITS FOR THIS SERVICE ARE DENIED. OUR CLINICAL STAFF REVIEWED THE INFORMATION SENT AND DETERMINED THAT THE SERVICE DOES NOT MEET CLINICAL GUIDELINES. A NETWORK PROVIDER MAY NOT BILL THE MEMBER UNLESS WRITTEN PERMISSION WAS GIVEN BEFORE THE SERVICE WAS RECEIVED.

42. S.S.'s treatment between March 1, 2019, and April 15, 2019, was denied for:

> S8 – YOUR PLAN PROVIDES BENEFITS FOR SEVICES THAT ARE DETERMINED TO BE COVERED HEALTH SERVICES. THE INFORMATION RECEIVED DOES NOT SUPPORT MEASURABLE PROGRESS TOWARD DEFINED TREATMENT GOALS FOR THESE SERVICES. THEREFORE, ADDITIONAL BENEFITS ARE NOT AVAILABLE.

43. S.S.'s treatment between April 16, 2019, through May 31, 2019, was denied for:

> B6 – BENEFITS FOR THIS SEVICE ARE DENIED. WE SENT A LETTER TO THE PROVIDER ASKING FOR ADDITIONAL INFORMATION. WE HAVE NOT RECEIVED A RESPONSE.

44. On September 24, 2019, J.S. submitted a level one appeal for S.S.'s treatment at CALO between January 1, 2019, through May 31, 2019.[1]

45. In the level one appeal, J.S. submitted S.S.'s medical records which included a psychological evaluation from May 23, 2013, a report of a neuropsychological evaluation from August 2013, S.S.'s full and individual evaluation disability report, another report of a neuropsychological evaluation from 2015, medical records from S.S.'s time at Anasazi, her medical records from ViewPoint, a letter from one of S.S.'s treating clinicians, Jeffery Holloway, MSW, and all of her medical records from CALO up to the point of submission which were over a thousand pages.

46. J.S. also identified several different ways in which United violated ERISA and requested for future evaluations that:

> We request that the assigned reviewer be board certified in psychiatry and have experience treating adolescents in a residential setting who suffered from [S.S]'s specific diagnosis of reactive attachment disorder and posttraumatic stress disorder, as well as a history of diagnosis of disruptive mood dysregulation disorder, oppositional defiant disorder, and cannabis use disorder, mild.

47. J.S. argued that this was a valid request under ERISA, and since J.S. never received any formal denial letter, Plaintiffs did not know who evaluated S.S.'s claim, what guidelines they used to evaluate it, or what information they had when evaluating S.S.'s claim.

48. In addition, J.S. also requested that:

> [I]f you do not pay these claims based on the information we have presenting in this appeal, please send us a copy of all documents under which our plan is operated, including all governing plan documents, the certificate of coverage, any insurance policies in place for the benefits we are seeking, any administrative eservices agreements that exist, any mental health and substance use disorder criteria (including SNF [skilled nursing facility], cognitive rehabilitation, and hospice criteria) utilized to evaluate the claim, and any reports or opinions provided to you from any physician or other professionals about this claim. As

---

[1] Plaintiffs had a separate insurance provider before January 1, 2019.

you are aware, these criteria are part of the documents under which our plan sis operated are essential for us to be able to conduct a formal parity analysis. In addition, please provide us with the names, qualifications, and health care claim denial rates of all individuals who reviewed these claims or with whom you consulted about these claims.

49. In a letter dated December 26, 2019, UBH sent a letter stating:

As requested, I have completed an appeal/grievance review on a request we received 09/26/2019. This review included an examination of the following information: Optum Case Notes, Letter of Appeal, and clinical records from the provider. After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode I have determined that benefit coverage is not available for the following reason(s):
A doctor reviewed your appeal. The Guideline used for the decision is the Optum Level of Care Guideline, MENTAL HEALTH: RESIDENTIAL TREATMENT CENTER and the Common Criteria and Clinical Best Practices for All Levels of Care.
We reviewed the letter of appeal and your medical records. Your child was admitted for treatment of problems with her mood and behaviors. Your child was participating in her treatment, and her condition improved. We've denied the following medical services: MENTAL HEALTH RESIDENTIAL TREATMENT CENTER as of 01 January 2019 and forward.
The criteria were not met because:
* Your child did not need the care provided in RESIDENTIAL TREATMENT CENTER setting.
* Your child could have been treated in a less intensive Level of Care
In your case:
* Your child was taking her medications and doing better.
* Your child had a more stable mood.
* Your child was keeping herself safe and not feeling like harming herself or others.
* Your child was not acting on every impulse.
* Your child was able to look after her day to day needs.
* Your child did not have clinical issues requiring 24-hour monitoring in a residential setting.
* Your child had a safe place to live the support of family. [sic.]
The request cannot be approved at this time by your health plan. Instead your child could have continued care in the MENTAL HEALTH INTENSIVE OUTPATIENT PROGRAM (IOP) setting, with family and community supports.

50. In a letter dated June 7, 2019, UBH denied S.S.'s care at CALO from June 4, 2019, forward and stated:

I have reviewed the plan for your child's admission to Change Academy at Lake of the Ozarks. Based on my review of the available documentation and all

10

> information received to date, I have determined that coverage is not available under your child's benefit plan for the following reasons(s): Benefit coverage of Mental Health Residential Care is not available on 06/04/2019 and forward. The guidelines used in the decision are Optum Level of Care Guidelines for Mental Health Residential and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Guidelines. It does not appear that your daughter is likely to improve much more at this level of care after eight months of treatment. She has improved during this time. Her behaviors are less extreme. She continues to need help with self-harming and impulsive moods. It appears this could be addresses [sic.] at a partial hospital program in her home area…. Treatment in her home area would actually make it possible to have family and individual sessions more than weekly.

51. On November 26, 2019, Plaintiffs submitted a level one appeal for S.S.'s service from June 1, 2019, through S.S.'s discharge from CALO.

52. The November 26, 2019, appeal states how United violated ERISA and included a psychological evaluation amendment from 2013, a report of a neuropsychological evaluation from 2013, a full and individual evaluation disability report from 2016, another report of a neuropsychological evaluation from 2015, medical records from Anasazi and ViewPoint, a letter from one of S.S.'s treating providers, and over two thousand pages of S.S.'s medical records from CALO.

53. J.S. also again made the request that,

> [I]f you do not pay this claim based on the information we have presented in this appeal, we ask that you provide us with the specific reasons for your determination along with any corresponding supporting evidence. We would also like to request that you send us a copy of any administrative services agreements that exist, any clinical guidelines or medical necessity criteria utilized to evaluate the claim, any mental health, substance use disorder, skilled nursing facility, inpatient rehabilitation, or hospice medical necessity criteria used to administer our plan, and any reports or opinions provided to you from any physician or other professional about this claim. As you are aware, these criteria are part of the documents under which the plan is operated. In addition, please provide us with the names, qualifications, and healthcare claim denial rates of all individuals who reviewed this claim or with whom you consulted about this claim.

//

54. In a letter dated January 18, 2020, UBH stated:

> As requested, I have completed an appeal/grievance review on a request we received 12/02/2019. This review included an examination of the following information: Internal Case Records, Medical Records and Your Letter of Appeal. After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode I have determined that benefit coverage is not available for the following reason(s):
> The non-coverage determination for mental health residential care will be upheld on 06/01/2019 and forward. The guidelines used in the decision are Optum Level of Care Guideline for Mental Health Residential and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Guidelines. Your daughter s [sic.] clinical information was reviewed. Her mood had improved. She was less impulsive. She had been able to have successful home passes. She was more redirectable. She had good family support. It seems that her care could have continued in a less intensive setting, such as partial hospitalization.

55. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

56. The denial of benefits for S.S.'s treatment was a breach of contract and caused J.S. to incur medical expenses that should have been paid by the Plan in an amount totaling over $100,000.

57. United failed to produce a copy of the plan documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of J.S.'s requests.

### FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

58. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

59. United failed to provide coverage for S.S.'s treatment in violation of the express terms of the plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

60. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

61. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the issues presented in J.S.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

62. United breached their fiduciary duties to S.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of S.S.'s claims.

63. The actions of United in failing to provide coverage for S.S.'s medically necessary treatment are a violation of the terms of the plan and its medical necessity criteria.

//

//

//

//

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

64. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

65. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

66. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

67. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

68. The explicit language of the Summary Plan Description ("SPD"), one of the governing plan documents, state that the Defendant will utilize generally accepted standards of medical practice that are "standards that are based on credible scientific evidence

published in peer-reviewed medical literature generally recognized by the relevant
medical community, relying primarily on controlled clinical trials, or, if not available,
observations studies from more than one institution that suggest a causal relationship
between the service or treatment and health outcomes" when evaluating the medical
necessity of treatment for purposes of evaluating coverage under the plan of mental
health claims.

69. The medical necessity criteria used by United for the intermediate level mental health
treatment benefits at issue in this case are more stringent or restrictive than the medical
necessity criteria the Plan applies to analogous intermediate levels of medical or surgical
benefits.

70. In addition, the level of care applied by United failed to take into consideration the
patient's safety if she returned to a home environment, as well as the risk of decline or
relapse if less intensive care than what was medically necessary was provided.
Generally accepted standards of medical practice for medical and surgical rehabilitation
under the Plan take into consideration safety issues and considerations of preventing
decline or relapse when admission into an intermediate care facility, such as a skilled
nursing or rehabilitation facility, is approved.

71. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the
benefits the Plan excluded for S.S.'s treatment include sub-acute inpatient treatment
settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation
facilities. For none of these types of treatment does United exclude or restrict coverage of
medical/surgical conditions by imposing restrictions such as an acute care requirement

for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

72. When United receives claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the plan based on generally accepted standards of medical practice. United evaluated S.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because United denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

73. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that S.S. received. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "Your child was keeping herself safe and not feeling like harming herself or others. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that S.S. received. United does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive benefits.

74. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

75. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

76.  As another example of the Plan's improper application of its criteria to evaluate the treatment S.S. received, the Defendants relied on assertions such as "She has improved during this time. Her behavioral are less extreme. She continues to need help with self-harming and impulsive moods." as a justification to deny treatment. In fact, improvement but not complete recovery serves as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

77. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the plan and the medical necessity criteria utilized by United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

78. United did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United were not in compliance with MHPAEA.

79. The violations of MHPAEA by United are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

80. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for S.S.'s medically necessary treatment at CALO under the terms of the plan, plus pre- and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs'

 Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

 DATED this 6th day of August, 2021.

By    s/ Brian S. King
    Brian S. King
    Attorney for Plaintiffs

County of Plaintiffs' Residence:
Tarrant County, Texas