UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISON

| | |
|---|---|
| J.S. and S.S.,<br><br>       Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY and UNITED BEHAVIORAL HEALTH,<br><br>       Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 25) AND GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 26)**<br><br>Case No. 2:21-cv-00483<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiffs J.S. and S.S. bring this action against Defendants United Healthcare Insurance Company and United Behavioral Health (collectively, "United") alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA").[1]  Plaintiffs filed suit on August 6, 2021, raising two causes of action: (1) recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) and (2) violation of the Mental Health Parity and Addiction Equity Act under 29 U.S.C. § 1132(a)(3).[2]  Plaintiffs subsequently withdrew their Parity Act claim.[3]  The parties filed

---

[1] 29 U.S.C. §§ 1001 *et seq.*

[2] (*See* Compl. ¶¶ 58–80, Doc. No. 2.)

[3] Plaintiffs confirmed withdrawal of the Parity Act claim in their briefing for the instant motions. (Pls.' Mot. for Summ. J. ("Pls.' MSJ") 37, Doc. No. 26; Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") 3, Doc. No. 32.)

cross-motions for summary judgment[4] and presented argument on these motions at a hearing on July 17, 2023.[5]

The court[6] has carefully reviewed the prelitigation appeal record and considered the parties' briefs and oral argument.[7]  Where a preponderance of the evidence shows S.S.'s treatment was medically necessary for some period of time after United denied benefits, but at least through May 31, 2019, summary judgment is granted in favor of Plaintiffs and denied as to United.  S.S. is entitled to an award of benefits through May 31, 2019, and claims for benefits after that date are remanded for further consideration, consistent with this order.

<u>BACKGROUND</u>

This dispute involves the denial of insurance benefits to Plaintiffs under their fully-insured employee welfare benefit plan.[8]  The plan was provided by J.S.'s employer, Anchor Products, LLC, offered and underwritten by United Healthcare Insurance Company, and governed by ERISA.[9]  J.S. was a plan participant at all times relevant to the claims in this case

---

[4] (Defs.' Mot. for Summ. J. ("Defs.' MSJ"), Doc. No. 25; Pls.' MSJ, Doc. No. 26.)

[5] (Minute Entry, Doc. No. 42.)

[6] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (Doc. No. 12.)

[7] The court has also reviewed the notice of supplemental authority and response filed by the parties.  (*See* Notice of Suppl. Authority, Doc. No. 37; Defs.' Resp. to Pls.' Notice of Suppl. Authority, Doc. No. 38.)

[8] (*See* Compl. ¶ 3, Doc. No. 2.)

[9] (*See id.*; Prelitigation Appeal Record ("Rec.") 50, 266, 476.)  The prelitigation appeal record was filed on a flash drive with the clerk's office and all documents were served upon the parties by email.  (*See* Notice of Conventional Filing, Doc. No. 24; Remark, Doc. No. 41.)

and his daughter, S.S., was a plan beneficiary.[10]  Plaintiffs sought treatment for S.S.'s mental health conditions at Change Academy Lake of the Ozarks ("CALO"), a residential treatment center.[11]  S.S. received care at CALO from August 10, 2018, to December 14, 2020.[12]  Through a series of "explanation of benefits" statements, responses to appeals by S.S.'s parents, and denial letters, United denied coverage for S.S.'s treatment at CALO from January 1, 2019 forward.[13] Plaintiffs contend United's denial of benefits caused them to incur more than $100,000 in medical expenses, which they allege should have been paid by United.[14]

## I.   The Plan

The plan covers services which United determines to be medically necessary.[15]  It defines "medically necessary services" as those that are:

- "Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the member's Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms."[16]

- "Not mainly for the convenience of the member, member's doctor, or other health care provider."[17]

---

[10] (*See* Compl. ¶ 3, Doc. No. 2.)

[11] (*See* Rec. 790, 4618.)

[12] (*Id.* at 801; Compl. ¶ 4, Doc. No. 2.)

[13] (Rec. 4659–96 (explanation-of-benefits statements); *id.* at 4618 (September 2019 appeal); *id.* at 790 (November 2019 appeal); *id.* at 39 (June 7, 2019 denial letter); *id.* at 693 (December 16, 2019 denial letter); *id.* at 713 (February 18, 2020 denial letter).)

[14] (Compl. ¶ 56, Doc. No. 2.)

[15] (Rec. 61, 277, 487.)

[16] (Rec. 120, 337–38, 550–51.)

[17] (*Id.*)

- "Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the member's Sickness, Injury, disease or symptoms."[18]

The plan provides coverage for mental health services deemed to be medically necessary, including treatment at residential treatment centers.[19]  United relied on Optum Level of Care Guidelines ("Optum Guidelines") in its benefit determination for S.S.'s mental health claims while at CALO.[20]  Optum Guidelines' criteria for admission to a residential treatment center require:

- Safe, efficient, effective assessment and/or treatment of the member's condition requiring the structure of a 24-hour/seven days per week treatment setting. Examples include the following:

  - Behavioral, cognitive, psychosocial, or environmental problems which endanger the welfare of the member or others, which are likely to threaten the member's safety, or which undermine the member's engagement in a less intensive level of care.[21]

- "The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care."[22]

- "Services are medically necessary."[23]

- "For all levels of care, services must be for the purpose of diagnostic study or reasonably be expected to improve the patient's condition.  The treatment must, at a minimum, be designed to reduce or control the patient's psychiatric symptoms

---

[18] (*Id.*)

[19] (Rec. 67–68, 120, 283–84, 336–37, 495, 551–52.)

[20] (*See id.* at 39, 693, 713.)

[21] (*See id.* at 4714.)

[22] (*Id.* at 4702.)

[23] (*Id.*)  Optum Guidelines' definition of "medically necessary" differs slightly from the plan's definition, but the guidelines note "[t]here may be variations of Medical Necessity according to unique contractual . . . requirements."  (*Id.* at 4702 n.2.)  Thus, the plan's definition controls.

so as to prevent relapse or hospitalization, and improve or maintain the patient's level of functioning."[24]

Optum Guidelines' criteria for continued stay at a residential treatment center require:

- "Treatment is not primarily for the purpose of providing custodial care."[25]

- "The admission criteria continue to be met and active treatment is being provided."[26]

- "The factors leading to admission have been identified and are integrated into the treatment and discharge plans."[27]

- "The member's family and other natural resources are engaged to participate in the member's treatment as clinically indicated and feasible."[28]

Optum Guidelines' criteria for discharge from a residential treatment center require:

- The continued stay criteria are no longer met. For example, when the factors which led to admission have been addressed to the extent that the member can be safely transitioned to a less intensive level of care, or no longer requires care.[29]

---

[24] (*Id.* at 4702–03.)  "It is not necessary that a course of therapy have as its goal restoration of the patient to the level of functioning exhibited prior to the onset of the illness, although this may be appropriate for some patient[s].  For many other psychiatric patients, particularly those with long-term chronic conditions, control of symptoms and maintenance of a functional level to avoid further deterioration or hospitalization is an acceptable expectation of improvement.  'Improvement' in this context is measured by comparing the effect of continuing treatment versus discontinuing it.  Where there is a reasonable expectation that if treatment were withdrawn the patient's condition would deteriorate, relapse further, or require hospitalization, this criterion is met."  (*Id.*)

[25] (*Id.* at 4715.)

[26] (*Id.* at 4703.)

[27] (*Id.*)

[28] (*Id.*)

[29] (*See id.* at 4732; *see also id.* at 4740.)  For the most part, the parties rely on criteria from the 2019 Optum Guidelines in their papers.  But where United relies on discharge criteria from the 2018 Optum Guidelines in its briefing (which articulates this standard slightly differently), so does the court.  (*See* Defs.' MSJ 23, Doc. No. 25; Defs.' Opp'n 12, Doc. No. 31.)

## II.    S.S.'s Background, Condition, and Treatment[30]

S.S. was born in 2003 and adopted by J.S. and his wife, C.S., in 2010, when she was six years old.[31]  S.S.'s biological parents had a history of bipolar disorder, depression, alcoholism, and drug addiction.[32]  S.S. had a traumatic childhood; she witnessed domestic violence between her biological parents, was exposed to marijuana at an early age, and was subjected to verbal and physical abuse.[33]  She was removed from her biological parents and placed in foster care at the age of two.[34]  Around age four, S.S. was first diagnosed with adjustment disorder, anxiety disorder, and oppositional defiant disorder.[35]

By the time J.S. and C.S. adopted S.S., she had experienced two failed adoptions, was separated from her biological siblings, and had been in the foster care system for four years

---

[30] United contends facts related to S.S.'s early childhood and past therapy are irrelevant and constitute inadmissible hearsay "inappropriate for summary judgment."  (Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n) 3–4, Doc. No. 31.)  However, J.S. submitted S.S.'s early childhood and past therapy information to United for consideration in S.S.'s appeals.  (*See* Rec. 793–802, 4624–32.)  Accordingly, it is relevant as part of the prelitigation record.  Moreover, hearsay is "routinely allow[ed] in the administrative record in ERISA case[s]."  *Adair v. El Pueblo Boys' & Girls' Ranch, Inc.*, No. 06-cv-01343, 2008 U.S. Dist. LEXIS 21989, at *24 (D. Colo. Mar. 20, 2008) (unpublished); *see also Malenski v. Std. Ins. Co.*, No. CIV-11-408-SPS, 2012 U.S. Dist. LEXIS 138893, at *2 (D. Okla. Sept. 27, 2021) (unpublished) (agreeing that "the Court reviews the administrative record actually considered by the plan administrator, including exhibits ordinarily [] excluded under the Federal Rules of Evidence.")  S.S.'s early childhood and past therapy is appropriately considered.

[31] (Rec. 794.)

[32] (*Id.*)

[33] (*Id.*)

[34] (*Id.*)

[35] (*Id.* at 794–95.)

across twelve homes.[36]  After the adoption, S.S. was diagnosed with attention-deficit hyperactivity disorder, alcohol/drug-related birth defect syndrome, and reactive detachment disorder.[37]  And S.S.'s behavioral issues (such as self-harm, suicidal ideation, violence toward others, extreme and uncontrollable rages, destructive behaviors, fixation on sex and violence, drug use, etc.) continued and worsened.[38]  These behaviors were exacerbated when S.S. began attending school.[39]

In 2012, just before starting third grade, S.S. was admitted to Cook Children's Hospital for five days to "address violence toward others, self-harm, and disruptive behaviors."[40]  She also attended a two-week day program to practice coping skills related to those behaviors.[41]  In fourth grade, S.S. was admitted to Cook Children's Hospital for seven more days to address "violence to others, self-harm behavior, mood irritability, and disruptive behavior," after which she attended a seven-week program at another facility.[42]  S.S. continued to exhibit disruptive and dangerous behavior, despite various intervention efforts.[43]  On April 17, 2018, after a particularly violent and destructive episode at school where S.S. threatened suicide and acted aggressively

---

[36] (*Id.* at 794, 796.)

[37] (*Id.* at 796, 798.)

[38] (*Id.* at 796–800.)

[39] (*Id.*)

[40] (*Id.* at 796.)

[41] (*Id.*)

[42] (*Id.* at 797.)

[43] (*See id.* at 797–800.)

toward C.S. and police officers, S.S. was taken to an inpatient psychiatric hospital.[44]  Afterward, S.S.'s parents sought long-term mental health treatment for S.S.[45]

From May 11, 2018, to June 21, 2018, S.S. received treatment at Anasazi Foundation, an outdoor behavioral health program.[46]  And from June 21, 2018, to August 10, 2018, S.S. received treatment at ViewPoint Center, a short-term residential treatment program.[47]  But neither facility provided a high enough level of care to meet S.S.'s needs.  Treatment providers at both facilities recommended a higher level of care.[48]  Specifically, the supervising clinician at Anasazi reported S.S. continued "to be an extreme danger to herself and danger to others," and needed a higher level of care.[49]  And an interdisciplinary treatment team at ViewPoint recommended "continued treatment in a residential setting to better meet [S.S.'s] psychiatric, therapeutic, and educational needs."[50]  In particular, a licensed clinical psychologist at ViewPoint expressed that if S.S. were not provided with a higher level of care, her educational, occupational, and social functioning would be negatively impacted.[51]  He also concluded genuine therapeutic gains would require "slow laborious work" in light of S.S.'s conditions.[52]

---

[44] (*Id.* at 800.)

[45] (*See id.* at 800–01.)

[46] (*Id.* at 801.)

[47] (*Id.*)

[48] (*See id.* at 801, 5009, 5691, 5705, 5761, 5793, 5809.)

[49] (*Id.* at 5009.)

[50] (*Id.* at 5761.)

[51] (*Id.* at 5793.)

[52] (*Id.*)

S.S. was admitted to CALO on August 10, 2018.[53]  By that time, she had been diagnosed with reactive attachment disorder; posttraumatic stress disorder; cannabis use disorder, mild; disruptive mood dysregulation disorder; and oppositional defiant disorder.[54]  Upon admission to CALO, Shannon Martin, MA, PLPC (S.S.'s therapist during her time at CALO) created an initial treatment plan for S.S.[55]  This plan identified the following reasons for S.S.'s admission: inability to self-regulate resulting in multiple hospitalizations, destructive and aggressive behavior, emotional dysregulation evidenced by severe tantrums lasting more than an hour and resulting in property damage, threats and physical harm, drug use, sexual behaviors, failing school, and placing herself in unsafe environments.[56]  Initial treatment objectives for S.S. included "[d]evelopment of therapeutic relationships," "emotional and physical safety of all family members," and "building trusting relationships."[57]  Ms. Martin created monthly treatment plans while S.S. was at CALO.  These plans (discussed below) describe S.S.'s overall progress and document any noteworthy events month-to-month.[58]

---

[53] (*Id.* at 801.)

[54] (*Id.* at 5006, 7078.)

[55] (*Id.* at 7078.)

[56] (*Id.*)

[57] (*Id.* at 7079.)

[58] (*See, e.g.*, *id.* at 6846–53 (September 2018 Treatment Plan); *id.* at 6084–93 (January 2019 Treatment Plan); *id.* at 2219–28 (March 2019 Treatment Plan).)

### III.    United's Benefit Denials

Although S.S. received care at CALO beginning August 10, 2018, this dispute relates to coverage for her care beginning January 1, 2019.[59]  Between April 4, 2019 and August 26, 2019, Plaintiffs received a series of explanation-of-benefits statements ("EOBs") from United regarding coverage for S.S.'s treatment at CALO.[60]  Taken together, the EOBs denied benefits for S.S.'s care at CALO from January 1, 2019 through May 31, 2019.[61]  EOBs sent on April 4, 2019 and April 18, 2019, denied benefits from January 1, 2019 through February 28, 2019, indicating "the service does not meet clinical guidelines," and identifying lack of preauthorization as the reason benefits were denied.[62]  EOBs sent on May 6, 2019 and May 20, 2019, denied benefits from March 1, 2019 through April 15, 2019, identifying a lack of "measurable progress toward defined treatment goals" as the reason benefits were denied.[63]  EOBs sent on July 22, 2019 and August 26, 2019 denied benefits from April 16, 2019 through May 31, 2019, identifying failure to receive "additional information" requested from CALO as

---

[59] The status of S.S.'s coverage before January 1, 2019 is unclear.  Both at the hearing and in their motion, Plaintiffs indicate United paid for the first several months of S.S.'s treatment and began denying coverage starting January 1, 2019.  (Pls.' MSJ ¶ 38, Doc. No. 26.)  But the parties also indicate S.S. had a separate insurance provider before January 1, 2019.  (Compl. ¶ 44 n.1, Doc. No. 2 ("Plaintiffs had a separate insurance provider before January 1, 2019."); Defs.' MSJ 2 n.2, Doc. No. 25 ("S.S. was admitted to CALO on August 10, 2018, but was under a different healthcare plan.  Thus, coverage only for her treatment from January 1, 2019[,] is in dispute.").)  The record also contains a version of the plan with an effective date of August 1, 2018.  (*See* Rec. 50.)  Despite these inconsistencies, the parties agree coverage for S.S.'s care from January 1, 2019 forward is what is in dispute.  (Defs.' MSJ 2 n.2, Doc. No. 25; Pls.' MSJ 1–2, Doc. No. 26.)  Accordingly, this is the time frame the court also considers.

[60] (Rec. 4660–96.)

[61] (*See id.*)

[62] (*Id.* at 4661 (April 4, 2019); *id.* at 4666 (April 18, 2019).)

[63] (*Id.* at 4671 (May 6, 2019); *id.* at 4676–77 (May 20, 2019), 4682–83 (duplicate record).)

the reason benefits were denied.[64]  None of the EOBs indicate treatment was not medically necessary.[65]

On September 24, 2019, J.S. and C.S. appealed United's denial of benefits from January 1, 2019 through May 31, 2019, challenging the rationale in the EOBs.[66]  J.S. and C.S. attached numerous documents to their appeal, including psychological and neuropsychological evaluations and S.S.'s medical records from Anasazi, ViewPoint, and CALO.[67]  On December 26, 2019, United upheld its denial of benefits for S.S.'s treatment from January 1, 2019 forward (rather than from January 1, 2019 through May 31, 2019).[68]  Based on a review of Plaintiffs' appeal, "clinical records from the provider," and relying on Optum Guidelines, Dr. Howard Wong, MD (Behavioral Medical Director for United), determined S.S. "could have been treated in a less intensive Level of Care" because she was "taking her medications and doing better," "had a more stable mood," "was keeping herself safe and not feeling like harming herself or others," "was not acting on every impulse," "was able to look after her day to day needs," "did not have clinical issues requiring 24-hour monitoring in a residential setting," and "had a safe place to live [and] the support of family."[69]

In addition, United sent a letter to S.S.'s parents on June 7, 2019, from Dr. Ronald Beach, MD (Associate Medical Director for United), explaining coverage for S.S.'s treatment at CALO

---

[64] (*Id.* at 4688 (July 22, 2019); *id.* at 4693 (August 26, 2019).)

[65] (*See id.* at 4660–96.)

[66] (*Id.* at 4618–52.)

[67] (*See id.* at 4653–7550.)

[68] (*Id.* at 693.)

[69] (*Id.* at 694.)

was unavailable from June 4, 2019 forward.[70]  In the letter, Dr. Beach concluded S.S. was

unlikely to improve more at that level of care and S.S.'s "behaviors [were] less extreme."[71]

While Dr. Beach acknowledged S.S. required continued "help with self-harming and impulsive

moods," he determined "this could be addressed at a partial hospital program in [S.S.'s] home

area" especially since "[t]he best place for children and adolescents is at home with their

families."[72]  Dr. Beach relied on Optum Guidelines in arriving at this determination.[73]

On November 26, 2019, J.S. and C.S. submitted a second appeal, challenging United's

denial of benefits from June 1, 2019 forward.[74]  On February 18, 2020, United upheld its denial

of benefits for this time period.[75]  After reviewing S.S.'s internal case records, medical records,

Plaintiffs' second appeal, and relying on Optum Guidelines, Dr. Sherifa Iqbal, MD (Behavioral

Medical Director for United) determined S.S.'s "mood had improved," "she was less impulsive,"

"she had been able to have successful home passes," "she was more redirectable," "she had good

family support," and "her care could have continued in a less intensive setting, such as partial

---

[70] (*Id.* at 39.)  Dr. Beach's letter denies coverage from June 4, 2019 forward, but the appeal associated with this denial challenges United's denial of benefits from June 1, 2019 forward. (*See* Rec. 790.)  The parties also treat this denial letter as a denial of coverage from June 1, 2019 forward in their briefs.  (*See* Defs.' MSJ, Statement of Material Facts (SMF) ¶ 71, Doc. No. 25; Pls.' MSJ 24 n.163, Doc. No. 26 ("United technically never issued a first denial letter denying treatment from June 1 to June 3, 2019, but Plaintiffs assume United meant to.").)  Accordingly, the court does also.

[71] (Rec. 39.)

[72] (*Id.* at 39–40.)

[73] (*Id.* at 39.)

[74] (*Id.* at 790–806.)

[75] (*Id.* at 713.)

hospitalization."[76]  Having exhausted their prelitigation appeal obligations, Plaintiffs filed suit in federal court.[77]

<u>LEGAL STANDARDS</u>

## I.      Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[78]  When both parties move for summary judgment in an ERISA case, "summary judgment is merely a vehicle for deciding the case" as the parties have effectively "stipulated that no trial is necessary."[79]  For ERISA claims, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[80]

## II.     Denial of Benefits Claims

ERISA authorizes challenges to a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) but fails to specify the standard of review courts should apply.[81]  To fill this gap, the Supreme Court has determined, in general, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary

---

[76] (*Id.*)

[77] (*See* Compl., Doc. No. 2; *see also* Defs.' MSJ, SMF ¶ 75, Doc. No. 25 ("Plaintiffs exhausted their pre-litigation appeal obligations.").)

[78] Fed. R. Civ. P. 56(a).

[79] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotation marks omitted).

[80] *Id.* (internal quotation marks omitted).

[81] *See Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009).

discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[82]
Here, despite discrepancies as to the applicable standard of review in their initial briefing, the
parties' subsequent papers and oral argument reflect their agreement that the correct standard in
this case is de novo review.  Accordingly, Plaintiffs' denial of benefits claim is reviewed de
novo.[83]

     "When applying a de novo standard in the ERISA context, the role of the court reviewing
a denial of benefits is to determine whether the administrator made a correct decision."[84]  The de
novo standard "is not whether 'substantial evidence' or 'some evidence' supported the
administrator's decision."[85]  Rather, "it is whether the plaintiff's claim for benefits is supported
by a preponderance of the evidence based on the district court's independent review."[86]  In
reviewing a plan administrator's benefits determination, courts are limited to the rationale given
by the plan administrator.[87]

---

[82] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[83] *See L.C. v. Blue Cross & Blue Shield of Tex.*, No. 2:21-cv-00319, 2023 U.S. Dist. LEXIS
24392, at *30 (D. Utah Feb. 10, 2023) (unpublished) (proceeding with de novo review where the
parties agreed de novo review was proper); *see also L.D. v. UnitedHealthcare Ins.*, No.
1:21-cv-00121, 2023 U.S. Dist. LEXIS 132717, at *27 (D. Utah July 28, 2023) (unpublished)
(same).

[84] *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (internal
quotation marks omitted).

[85] *Id.* at 833.

[86] *Id.*; *see also Ray v. UNUM Life Ins. Co. of Am.*, 244 F. App'x 772, 782 (10th Cir. 2007)
(unpublished) (approving district court's application of preponderance of evidence standard).

[87] *See Brian J. v. United Healthcare Ins. Co.*, No. 4:21-cv-42, 2023 U.S. Dist. LEXIS 58616, at
*15 (D. Utah Mar. 31, 2023) (unpublished) ("In reviewing [the plan administrator's]
determination, the court is limited to the rationale given . . . for the denial of benefits."); *see also
L.D.*, 2023 U.S. Dist. LEXIS 132717, at *27 ("[T]he court 'will consider only those rationales
that were specifically articulated in the administrative record as the basis for denying a claim.'"

Plaintiffs prevail in this case because they have shown by a preponderance of the evidence that it was medically necessary for S.S. to continue to receive residential treatment until at least May 31, 2019.

## ANALYSIS

Plaintiffs make both procedural and substantive arguments.  First, Plaintiffs argue Defendants improperly denied S.S.'s claims by failing to comply with ERISA's procedural requirements.[88]  Next, Plaintiffs substantively argue S.S.'s care was medically necessary under Optum Guidelines, used by United.[89]  For its part, United contends it substantially complied with ERISA's procedural requirements and argues Plaintiffs have failed to demonstrate S.S.'s continued treatment at CALO was medically necessary from January 1, 2019 forward.[90]

The parties' procedural arguments are addressed first, followed by their substantive arguments regarding medical necessity.

## I.       De Novo Review of United's Benefit Denials

### a.  Procedural Requirements

Plaintiffs contend United's denial letters were procedurally deficient because they failed to reflect a "full and fair review" or articulate a "reasoned and principled process," applying the

---

(quoting *Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012))).

[88] (Pls.' MSJ 28, Doc. No. 26.)

[89] (*Id.* at 34.)

[90] (Defs.' Opp'n 7, 25, Doc. No. 31; Defs.' MSJ 21, Doc. No. 25.)

plan's standards for medical necessity to S.S.'s medical records.[91]  United contends it provided a full and fair review of Plaintiffs' claim as required by ERISA.[92]

Notwithstanding the parties' arguments, "issues of procedural irregularity go to what standard of review this court should employ."[93]  Where the parties agree the de novo review standard applies, the only question is substantive: "whether the administrator made a correct decision" in denying benefits.[94]  Where the parties agree de novo review is appropriate, and where the record shows S.S. was entitled to benefits at least through May 31, 2019, as described below, the court need not address the procedural sufficiency of United's denial letters.

       *b.*   *Medical Necessity*

In this case, there is no dispute as to whether S.S. needed care.  The question is whether the care S.S. received at CALO was at the proper level for her condition under the plan's definition of "medical necessity" from January 1, 2019 forward.  The plan defines services as "medically necessary" when they are "[c]linically appropriate, in terms of type, frequency, extent, service site and duration" and "not more costly" than an alternative service or service site which is "at least as likely to produce equivalent therapeutic or diagnostic results."[95]  United

---

[91] (Pls.' MSJ 28–31, Doc. No. 26.)

[92] (Defs.' Opp'n 7–10, Doc. No. 31.)

[93] *Christine S. v. Blue Cross Blue Shield of N.M.*, No. 2:18-cv-00874, 2021 U.S. Dist. LEXIS 199330, at *21 (D. Utah Oct. 14, 2021) (unpublished).

[94] *Niles*, 269 F. App'x at 832.

[95] (Rec. 120, 337, 550–51.)

used Optum Guidelines in its evaluation of whether S.S.'s continued care at CALO was clinically appropriate and the most cost-effective treatment likely to produce equivalent results.[96]

United argues its denial of benefits for S.S.'s treatment at CALO from January 1, 2019 forward was justified, is supported by the record, and is bolstered by the fact that three separate internal reviewers concluded S.S.'s continued residential treatment was not medically necessary.[97] United contends S.S.'s medical records after December 31, 2018, establish her condition had improved to the extent a lower level of care was warranted. According to United, the records show S.S. "was consistently engaged in individual, family, and group therapy, was open and receptive to feedback, [] could manage her emotions better," had a supportive and involved family, her behaviors were less extreme, she could better regulate her behaviors, and she was unlikely to improve much more at the residential treatment level of care.[98] While conceding S.S. "hit some bumps in the road" after January 1, 2019, United argues her "continued improvement and ability to better regulate herself illustrate that she could have been safely and effectively treated in a less intensive setting."[99]

United relies heavily on the following provisions of Optum Guidelines in justifying its denials:[100]

- "For all levels of care, services must be for the purpose of diagnostic study or reasonably be expected to improve the patient's condition. The treatment must, at a minimum, be designed to reduce or control the patient's psychiatric symptoms

---

[96] (*Id.* at 39, 693, 713.)

[97] (Defs.' MSJ 21, Doc. No. 25; Defs.' Opp'n 10, Doc. No. 31.)

[98] (*See* Defs.' MSJ 24, Doc. No. 25; *id.* at 21–22 (citing Rec. 39, 693–94, 713–14).)

[99] (Defs.' Opp'n 15, Doc. No. 31.)

[100] (*See* Defs.' MSJ 22–24, Doc. No. 25; Defs.' Opp'n 11, 12, 15, Doc. No. 31.)

so as to prevent relapse or hospitalization, and improve or maintain the patient's level of functioning."[101]

- "It is not necessary that a course of therapy have as its goal restoration of the patient to the level of functioning exhibited prior to the onset of the illness, although this may be appropriate for some patients. For many other psychiatric patients, particularly those with long-term chronic conditions, control of symptoms and maintenance of a functional level to avoid further deterioration or hospitalization is an acceptable expectation of improvement."[102]

- "The factors which led to admission have been addressed to the extent that the member can be safely transitioned to a less intensive level of care, or no longer requires care."[103]

Plaintiffs argue United erred in denying benefits because the record clearly demonstrates S.S.'s continued treatment at CALO was medically necessary from January 1, 2019 forward.[104] Plaintiffs contend United's internal reviewers missed "glaringly obvious pieces of crucial information" contained in S.S.'s medical records, which, they contend, resulted in United's reviewers making a "number of false statements" and relying on erroneous rationale for their denials.[105] Plaintiffs contend United's representation of S.S.'s conditions and level of improvement as of December 31, 2018 is inaccurate. Plaintiffs identify at least forty-eight[106]

---

[101] (Rec. 4702.)

[102] (*Id.* at 4703.) United does not rely on the second half of this provision which states, "'[i]mprovement' in this context is measured by comparing the effect of continuing treatment versus discontinuing it. Where there is a reasonable expectation that if treatment were withdrawn the patient's condition would deteriorate, relapse further, or require hospitalization, this criterion is met." (*Id.*)

[103] (*Id.* at 4732.)

[104] (Pls.' MSJ 34, Doc. No. 26; *see also* Pls.' Opp'n 10, Doc. No. 32.)

[105] (Pls.' Opp'n 12, Doc. No. 32.)

[106] Plaintiffs' motion indicates they identified sixty-nine incidents where S.S.'s mental health disorders manifested, but this number appears to account for the entirety of S.S.'s medical records submitted with her appeals, including records documenting incidents before December

incidents between January 1, 2019 and November 23, 2019, where S.S.'s "mental health disorders manifested in alarming ways that would likely have compromised her safety had CALO[] staff not caught and addressed them."[107]

Having considered the parties' arguments and after careful review of the record, it is apparent that Plaintiffs' claim for benefits is supported by a preponderance of the evidence. The record shows S.S.'s continued care at CALO was medically necessary at least through May 31, 2019, based on her continued dysregulation risking harm to herself or others, the turbulent nature of her family relationships, her participation in therapy, and the opinion of her treating therapist. Each is addressed below.

i.  Dysregulation and Risk of Harm to Self or Others

The rate at which S.S. dysregulated in a manner risking harm to herself or others, at least through May 2019, undermines and contradicts United's decision to deny benefits from January 1, 2019 forward.

Several factors which led to S.S.'s admission at CALO—such as the inability to self-regulate resulting in multiple hospitalizations, destructive and aggressive behavior, and emotional dysregulation evidenced by severe tantrums lasting more than an hour and resulting in

---

31, 2018.  (*See* Pls.' MSJ 35, Doc. No. 26.)  However, at least forty-eight incidents identified by Plaintiffs occurred during the relevant time period: January 1, 2019 through November 23, 2019.

[107] (*See* Pls.' MSJ 35, Doc. No. 26.)  Because Plaintiffs submitted their second appeal on November 26, 2019, they only submitted S.S.'s medical records through November 23, 2019. (*See* Rec. 790, 1772.)  Accordingly, that is the record United considered during the prelitigation appeal—and the record the court considers here.  (*See* Pls.' MSJ, 24 n.162, Doc. No. 26 ("Because this appeal was submitted on November 26, 2019, C. and J. were only able to attach S.'s medical records at CALO through November 23, 2019. . . .  Accordingly, the records available in the prelitigation appeal record only correspond to S.'s treatment at CALO through November 23, 2019.").)

property damage, threats, and physical harm[108]—had not been addressed sufficiently for S.S. to be safely transitioned to a less intensive level of care as of January 1, 2019, as required by Optum Guidelines.[109]  For instance, in support of the claim that S.S. could safely be treated in a less intensive setting, United relies on a statement from Ms. Martin (S.S.'s treating therapist at CALO) indicating S.S. was "able to self[-]regulate 70% of the time" and "only requir[ed] an assist 5% of the time."[110]  But Ms. Martin made this statement on June 24, 2019, six months after United declined S.S.'s coverage at CALO and after six months of additional treatment for S.S.[111]  Nothing in the record indicates this statement was true as of January 1, 2019.  As of this date, S.S. still demonstrated frequent dysregulation resulting in aggression and attempts to cause (or actually causing) harm to others and herself (including suicidal ideation).  Incidents of dysregulation occurred at least twenty-six times from January through May 2019.[112]

---

[108] (*See* Rec. at 7078.)

[109] (*See id.* at 4732.)

[110] (Defs.' MSJ 24, Doc. No. 25 (citing Rec. 2304).)  Based on medical records, an "assist" means CALO staff members were required to perform an "emergency safety physical intervention," meaning they had to physically restrain S.S.  (*See, e.g.*, Rec. 2265.)

[111] (*Id.* at 2304.)

[112] (*See id.* at 2958–60 (physical aggression, attempt to harm CALO staff, required emergency safety physical intervention ("assist") by CALO staff); *id.* at 2950–25 (physical aggression, attempt to harm CALO staff, required staff assist); *id.* at 2935–36 (physical aggression, required staff assist); *id.* at 2928 (physical aggression, harm to CALO staff; required staff assist); *id.* at 2886 (physical aggression, attempt to harm CALO staff, required staff assist); *id.* at 2827 (self-harm); *id.* at 2813, 2819 (physical aggression, required staff assist); *id.* at 2817 (self-harm); *id.* at 2809 (physical aggression, harm to other CALO resident); *id.* at 2802 (verbal aggression, required staff assist); *id.* at 2800–01 (physical and verbal aggression, contemplated self-harm, required staff assist); *id.* at 2761 (physical aggression, required staff assist); *id.* at 2744 (physical aggression; attempt to harm CALO staff); *id.* at 2739 (physical aggression); *id.* at 2698 (physical aggression, harm to other CALO resident); *id.* at 2667 (verbal aggression including threatening peers); *id.* at 2631 (self-harm); *id.* at 2629 (suicidal ideation); *id.* at 2625 (verbal aggression including threatening peers, self-harm); *id.* at 2621 (suicidal ideation); *id.* at 2616 (physical

S.S.'s December 2018 treatment plan[113] indicates an increase in staff assists due to emotional and physical dysregulation—from four in November to five in December.[114]   The December 2018 plan notes the overall need for "restraints [was] lessening," but S.S. needed to improve in the areas of "self-harm, physical aggression, verbal aggression, and refusals."[115]

S.S.'s January 2019 treatment plan notes a reduction in staff assists from five in December to four in January.[116]   This plan, again, notes the overall need for "restraints [was] lessening," but that S.S. needed to improve in the areas of "self-harm, physical aggression, verbal aggression, and refusals."[117]   On January 10, 2019, Dr. Jyotsna Nair, MD (one of S.S.'s treating physicians) reported that when S.S. dysregulates, "it is so fast that there is not time for [intervention].  [Although,] she gets out of it faster than she did in the past when she had just come in."[118]

S.S.'s February 2019 treatment plan indicates a reduction in staff assists from four times during January to three times in February.[119]   Despite this, the February plan also notes S.S.

---

aggression, self-harm, required staff assist); *id.* at 2602 (self-harm); *id.* at 2532 (physical aggression, required staff assist); *id.* at 2473 (physical aggression); *id.* at 2444, 2446 (physical aggression toward other CALO resident, self-harm); *id.* at 2385 (self-harm)).

[113] The treatment plans Ms. Martin prepared track S.S.'s overall treatment and progress month-to-month and document noteworthy events (positive and negative) during each review period.

[114] (*Id.* at 2780.)

[115] (*Id.*)

[116] (*Id.* at 6089.)

[117] (*Id.*)

[118] (*Id.* at 2928.)

[119] (*Id.* at 6079.)

"struggled to show a consistent ability during this review period to self-regulate,"[120] engaged in self-harm, and needed to improve in the areas of "self-harm, physical aggression, verbal aggression, and refusals."[121]

By March 29, 2019, Ms. Martin reported "[S.S.] is currently stable evidenced by safe behavior, few assists[,] and cooperation in individual and family therapy."[122]  But the March 2019 treatment plan also indicates S.S. was still dysregulating in a manner that posed a threat to herself or others forty percent of the time.[123]  The record shows S.S. continued to dysregulate at a high rate in April 2019 and May 2019—doing so in a manner that posed a threat to herself or others fifty-eight percent of the time in April and thirty percent of the time in May.[124]  However, S.S.'s treatment plans show a marked—and seemingly sustained—drop in S.S.'s rate of dysregulation from June 2019 forward.  Indeed, S.S. dysregulated in a manner that posed a threat to herself or others only seven percent of the time in June 2019[125] and ten percent of the time in July 2019.[126]  Rather than including a percentage, S.S.'s August 2019 treatment plan notes only a single incident of dysregulation during that review period.[127]

─────────────

[120] (*Id.* at 6078)

[121] (*Id.* 6079–80.)

[122] (*Id.* at 2577.)

[123] (*Id.* at 2225.)  The medical records indicate this percentage is calculated based on the number of incidents and reports per the number of days during the relevant review period.  (*See id.* at 2199.)

[124] (*Id.* at 2199 (April); *id.* at 2188 (May).)

[125] (*Id.* at 2166.)

[126] (*Id.* at 2066.)

[127] (*Id.* at 1941.)

The record evidence shows several of the arguably most severe factors which led to S.S.'s admission to CALO had not been addressed sufficient to permit a safe transition to a less intensive level of care as of January 1, 2019, as required by Optum Guidelines.[128]  The rate of S.S.'s dysregulation in a manner which risked harm to herself or others, at least through May 2019, undermines and contradicts United's determination that continued care at CALO was not "reasonably expected to improve [her] presenting problems"[129] so as to warrant denial of benefits from January 1, 2019 forward.

## ii.  Family Relationships

The nature of S.S.'s family relationships from December 2018 through at least May 2019, undermines United's decision to deny benefits from January 1, 2019 forward.

United points to S.S.'s "supportive and involved family" as another factor supporting its decision that continued care was not medically necessary from January 1, 2019 forward,[130] because "[t]he best place for children and adolescents is at home with their families."[131] However, the record shows S.S.'s family relationships were turbulent as of January 2019. According to S.S.'s December 2018 treatment plan, S.S. felt "a great deal of shame" regarding "the chaos within her adoptive family unit revolving around her."[132]  The December plan

---

[128] (*Id.* at 4732.)

[129] (*See id.* at 4703, 4714–15; *see also id.* at 39.)

[130] (*See* Defs.' MSJ 22, Doc. No. 25; Defs.' Opp'n 6, Doc. No. 31 (citing Rec. 693–94 (December 2019 denial letter); Rec. 713–14 (February 2020 denial letter)).)

[131] (Rec. 40 (June 2019 denial letter quoting an article from the American Academy of Child and Adolescent Psychiatry titled "Principles of Care for Treatment of Children and Adolescents with Mental Illness in Residential Treatment Centers").)

[132] (*Id.* at 2779.)

indicates S.S. struggled with her relationship with her father at that point in time.[133] While the plan notes some improvement in the ability of S.S.'s father to show empathy to S.S., it indicates further improvement was required.[134] The plan also indicates S.S.'s brother struggled to accept S.S. and her progress in therapy at that time.[135] Apparently, S.S.'s only positive relationship as of December 31, 2018 was with her mother.[136]

S.S.'s January 2019 treatment plan indicates the issues between S.S. and her father continued with no identifiable improvement.[137] It also expounds on the "significant relationship issues" between S.S. and her brother.[138] For the first time, the January plan contemplates the idea of S.S. visiting home when ready.[139]

The February 2019 treatment plan shows the issues between S.S., her father, and her brother continued with no notable improvement.[140] Again, it contemplates the possibility of a home visit when S.S. was ready.[141]

The March 2019 treatment plan reflects some progress with respect to S.S.'s family relationships. It notes S.S.'s parents are "committed to [her] healing and growth and their

---

[133] (*Id.*)

[134] (*Id.*)

[135] (*Id.*)

[136] (*Id.*)

[137] (*Id.* at 6088.)

[138] (*Id.*)

[139] (*Id.* at 6089.)

[140] (*Id.* at 6078.)

[141] (*Id.* at 6079.)

relationship" with her, are "teachable and willing to learn," and understand S.S. "needs to feel listened to, heard[,] and understood to heal their relationship and help [S.S.] heal."[142]  The March plan indicates S.S. was "kind and respectful to her parents in family therapy" even when feeling frustrated during this review period.[143]  It notes her father's continued struggle with "sharing empathy" but indicates he was "working to become better" in this regard.[144]  S.S.'s relationship with her brother is not mentioned in the March 2019 treatment plan (this relationship is not mentioned again until July 2019).[145]

S.S.'s relationship with her parents remained the same through April 2019.[146]  The May 2019 treatment plan reflects the next noteworthy progress in this area, indicating S.S. and her parents "made significant progress in their relationship," during this review period.[147]  S.S.'s father "worked on repair with [S.S.] to build trust during this review period," and "[S.S.] [was] receptive to his repair."[148]  The May treatment plan also reports S.S. went on her first home visit during this review period and it was "successful with no major dysregulation."[149]

---

[142] (*Id.* at 2224.)

[143] (*Id.*)

[144] (*Id.*)

[145] (*See id.* at 2066.)

[146] (*See id*. at 2198–99.)

[147] (*Id.* at 2187.)

[148] (*Id.*)

[149] (*Id.*)

Things remained consistent through June 2019,[150] with the next noteworthy progress reported in July 2019 when S.S. and her brother "began communicating again through email."[151] (From this, it would appear S.S. was not even speaking with her brother from at least March 2019 to July 2019.)  S.S. had her second successful home visit in July with "no major dysregulation."[152]

The record demonstrates S.S.'s family relationships were turbulent from December 2018 through at least May 2019.  This undermines the contention that the best place for S.S. as of January 1, 2019, was at home with her family, receiving a lower level of care, rather than in residential treatment.

### iii.   Participation in Therapy

United's determination that S.S. could be treated in a less intensive level of care as of January 1, 2019, was inconsistent with Optum Guidelines given her condition and specific therapeutic needs.

United contends S.S.'s consistent engagement in individual, family, and group therapy also supports its decision that continued care at CALO was not medically necessary from January 1, 2019 forward.[153]  A statement from Dr. Rigby, PsyD (a treating clinician at ViewPoint—the facility immediately preceding CALO) provides insight on how S.S.'s condition would likely impact her therapeutic progress.  Dr. Rigby indicated that for S.S. to experience any therapeutic success,

---

[150] (*See id.* at 2160–70.)

[151] (*Id.* at 2066.)

[152] (*Id.*)

[153] (*See* Defs.' MSJ, Doc. No. 25; *see also* Rec. 693.)

26

[t]rust will need to be established.  Based on testing, [S.S.] will have difficulty sustaining a therapeutic relationship.  She will make efforts during treatment to terminate long before substantial improvement has occurred. . . .  Efforts to explore self-sabotaging actions that create or reinforce negative consequences may result in a back-and-forth struggle therapeutically, with periods of temporary progress followed by retrogression.  As mentioned previously, genuine gains will require slow laborious work.[154]

The therapy notes in S.S.'s treatment plans confirm Dr. Rigby's prediction.

S.S.'s treatment plans show Ms. Martin implemented the CASA model as part of S.S.'s individual and family therapy.[155]  This model is comprised of four stages: commitment, acceptance, security, and attunement.[156]  The December 2018 treatment plan indicates S.S. was still working on stage one: commitment.[157]  For S.S. to work through the commitment stage, she needed to attend "weekly family and individual sessions, including[] all other therapy opportunities at CALO" and show a willingness to "work toward and through [her] attachment issues and developmental trauma."[158]

With respect to individual therapy, the December 2018 treatment plan indicates S.S. struggled "with becoming defiant, defensive, and combative."[159]  It also identified her individual therapeutic goals as working on "trusting her therapist to provide the most effective therapy for her," working through her developmental trauma, and working through her attachment issues,

---

[154] (Rec. 5793.)

[155] (*See, e.g.*, *id.* at 2778.)

[156] (*Id.*)

[157] (*Id.*)

[158] (*Id.*)

[159] (*Id.*)

among other things.[160]  With respect to family therapy, the December 2018 plan indicates S.S.

"dysregulate[d] and catastrophize[d] her environment . . . with her parents" and, despite

improvement, still struggled to show a consistent ability to self-regulate during family therapy.[161]

However, the December 2018 plan indicates S.S. participated consistently in group therapy and

was receptive to the input of others.[162]

By the end of January 2019, S.S. had progressed to the second CASA stage:

acceptance.[163]  Despite making "significant progress" regarding her defiant, defensive, and

combative behavior in individual therapy, the January 2019 plan shows the same goals as

December, indicating further improvement was required.[164]  With respect to family and group

therapy, the notes in the January 2019 treatment plan are the same as in December, with no

identifiable regression or progression reported.[165]

By the end of February 2019, S.S. had demonstrated improvement with respect to many

of her individual therapy goals, including working to trust her therapist.[166]  However, she

continued to demonstrate resistance toward working through her development trauma and

attachment issues.[167]  No identifiable regression or progress was reported for family therapy in

---

[160] (*Id.* at 2779.)

[161] (*Id.*)

[162] (*Id.* at 2780.)

[163] (*Id.* at 6087.)

[164] (*Id.* at 6087–88.)

[165] (*Compare id.* at 2778–80, *with id.* at 6087–89.)

[166] (*Id.* at 6078.)

[167] (*Id.*)

February 2019.[168]  But the February 2019 plan indicates S.S. struggled "with becoming very angry with her peers when she believed they were disrespecting her or being 'hypocrites'" in group therapy.[169]

By the end of March 2019, while receptive to certain types of therapy (like dyadic developmental psychotherapy), S.S. continued to resist other types of therapy (like brainspotting) which would allow her to dive deeper into her developmental trauma—indicating a lack of trust in her therapeutic relationship with Ms. Martin.[170]  S.S. made notable progress with respect to family therapy during this review period—there were no incidents of dysregulation during family therapy sessions and S.S. was reportedly kind and respectful to her parents even when frustrated.[171]  But S.S. struggled to participate in group therapy "in terms of being vulnerable" for this review period.[172]  She began withdrawing socially during group therapy, evidencing "aggression and isolation" whenever she felt overwhelmed, bullied, disrespected, or threatened.[173]

S.S. continued to struggle in individual and group therapy during April 2019.  Her April 2019 treatment plan reports S.S. was cooperative but guarded in individual therapy, resisted "vulnerability in group and individual settings," feared "moving toward her trauma," and

---

[168] (*Id.* at 6078–79.)

[169] (*Id.* at 6079.)

[170] (*Id.* at 2223.)

[171] (*Id.* at 2224.)

[172] (*Id.*)

[173] (*Id.* at 2225.)

struggled "not to isolate."[174]  These behaviors continued through, and possibly beyond, August 2019.  The August 2019 treatment plan indicates S.S. continued to demonstrate "[r]esistance toward moving deeper into [her] trauma."[175]

In other words, as Dr. Rigby predicted, S.S.'s therapeutic success required "slow laborious work" "with periods of temporary progress followed by retrogression"[176] such that treatment in a less intensive level of care as of January 1, 2019, would not have been as efficient or effective, and likely could have resulted in a deterioration of S.S.'s condition or relapse.  Under these circumstances, a lower level of care would be inconsistent with Optum Guidelines.[177]

### iv.  Opinion of Treating Therapist

The opinion of S.S.'s treating therapist, considered alongside other record evidence (including conclusions drawn by United's internal reviewers), demonstrates that S.S.'s continued care at CALO was medically necessary at least through May 31, 2019.

Plaintiffs contend United's position that continued treatment at CALO was not medically necessary is flawed because it gives greater weight to conclusions drawn by United's internal

---

[174] (*Id.* at 2198.)

[175] (*Id.* at 1941.)

[176] (*Id.* at 5793.)

[177] (*See id.* at 4702 (noting that Optum Guidelines' common admission criteria require that "[t]he member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care"); *id.* at 4703 (noting that Optum Guidelines' common admission criteria provide that "[w]here there is a reasonable expectation that if treatment were withdrawn the patient's condition would deteriorate, relapse further, or require hospitalization, [the 'improvement'] criterion is met.").)  Optum Guidelines' criteria for continued stay at a residential treatment center require the common admission criteria continue to be met.  (*Id.* at 4703, 4714–15.)

reviewers than the opinions of S.S.'s treating providers.[178]  United argues ERISA does not require an administrator to defer to the opinions of treating providers, and the consistency of its internal reviewers' conclusions is a factor to consider.[179]  At the summary judgment hearing, Plaintiffs clarified they do not argue plan administrators must give special deference to treating provider opinions—only that the opinions of treating providers are relevant to any benefits determination.  An analysis focusing on whether United's internal reviewers appropriately engaged with the opinions of S.S.'s treating providers is inconsistent with de novo review.[180]  Nevertheless, to the extent the record contains opinions from treating providers regarding S.S.'s need for continued residential care, those opinions are part of the prelitigation appeal record and, as such, are duly considered below.

United concedes, as of January 1, 2019, S.S. was still experiencing "issues" but contends those issues "did not require '24-hour monitoring in a residential setting'" making continued treatment at CALO not medically necessary.[181]  The record does not support this contention. S.S.'s treatment plans do not even begin to contemplate her eventual discharge from CALO until

---

[178] (*See* Pls.' Opp'n 12, Doc. No. 32.)

[179] (*See* Defs.' Reply 8–10, Doc. No. 35 (citing *Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 F. App'x 568, 576 (10th Cir. 2017) (unpublished)).)

[180] Even under an arbitrary and capricious standard, nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), *superseded by statute on other grounds*.  "Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."  *Id.*  At the same time, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Id.* at 834.  More broadly, "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory."  *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004).

[181] (Defs.' Opp'n 8, Doc. No. 31 (citing Rec. 694).)

March 2019.[182]  Even then, Ms. Martin (S.S.'s treating therapist) only indicates that discussions with S.S.'s parents regarding post-residential treatment needs would "occur when [S.S.] ha[d] provided time and evidence [demonstrating she could] maintain physical and emotional safety."[183]  Ms. Martin continues, "[S.S.] is not able to consistently maintain the short-term objectives at home at this time and requires the safety and structure of [a] residential setting."[184]  Ms. Martin maintains this opinion through at least August 2019,[185] and there is substantial evidence in the record supporting this opinion, as demonstrated above.  That opinion, considered alongside the rest of the record evidence, demonstrates by a preponderance of the evidence that S.S.'s continued care at CALO was medically necessary at least through May 31, 2019, contrary to the conclusions of United's internal reviewers.

        In sum, Plaintiffs have satisfied their burden of proving that treatment at CALO was medically necessary for some period after United began denying benefits.  Considering S.S.'s demonstration of a high rate of dysregulation putting herself and others at risk of harm through May 2019, the turbulent nature of her family relationships until at least April 2019, the importance of a consistent and sustained therapeutic relationship in light of S.S.'s specific condition, and S.S.'s treating therapist's opinion recommending residential treatment through at least August 2019, a preponderance of the evidence demonstrates S.S.'s continued care at CALO was medically necessary at least through May 31, 2019.

---

[182] (*See* Rec. 2225.)

[183] (*Id.*)

[184] (*Id.*)

[185] (*See id.* at 1941 (August 2019 treatment plan).)  It is unclear how long Ms. Martin maintained this opinion considering the latest treatment plan in the record is the plan for August 2019.

## II.     Appropriate Relief

Plaintiffs argue the court should reverse United's denial and award benefits for S.S.'s claims through November 23, 2019.[186]  For claims after that date, Plaintiffs request remand to United.[187]  United contends that even if the court determines benefits are available, remand is the appropriate remedy for S.S.'s claims through November 23, 2019.[188]  As for S.S.'s claims after that date, United initially argued remand is unavailable because Plaintiffs failed to exhaust their prelitigation appeal obligations, but later agreed at the hearing that remand was the appropriate remedy.[189]  Where the record makes clear S.S.'s continued care at CALO was medically necessary at least through May 31, 2019, benefits are awarded through May 31, 2019.  But where the medical necessity of S.S.'s continued treatment is less clear between May 31, 2019 to November 23, 2019, and where the record does not include medical records after November 23, 2019, those claims are remanded.

"Under *de novo* review, remand to the administrator is an available remedy, but is not always the appropriate one."[190]  "Remand is appropriate when a plan administrator "fail[s] to make adequate factual findings or fail[s] to adequately explain the grounds for [its] decision."[191] A court should only award benefits if "evidence in the record clearly shows that the claimant is

---

[186] (Pls.' MSJ 35, Doc. No. 26.)

[187] (*Id.*)

[188] (Defs.' Opp'n 16, Doc. No. 31.)

[189] (*Id.* at 18.)

[190] *Rasenack*, 585 F.3d at 1327.

[191] *Carlile v. Reliance Std. Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021) (internal quotation marks omitted).

entitled to benefits."[192]   Further, "remand is not appropriate to provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record."[193]

   *a.   Claims through November 23, 2019*

As detailed above, the record makes clear S.S. is entitled to benefits through at least May 31, 2019.  Accordingly, the court awards benefits and orders United to pay for S.S.'s treatment at CALO from January 1, 2019 to May 31, 2019.

United argues that if the court finds S.S.'s claims have merit, all of her claims through November 23, 2019, should be remanded so United may "determine the appropriate rate" of coverage, considering it "has not had the opportunity to determine how the use of a single billing code that covers excluded services" (like tuition for "school-based" services or services that are "solely educational in nature"[194]) "affects the amount to be covered."[195]  At the hearing, Plaintiffs argued this position was unavailing because children receiving care at residential treatment centers must be afforded a "free and appropriate public education."  United's remand argument is unpersuasive.  United did not justify its denials during the prelitigation appeal process on the need to determine coverage rates or parse out the "educational component" of S.S.'s care.  This rationale is not identified in any of the EOBs, denial letters, or anywhere else in the record.  Where United failed to raise this argument below, it may not do so now.  However, although a remand of claims from June through November 2019 is unjustified on these grounds,

---

[192] *Id.*

[193] *Id.*

[194] The plan does not cover "[s]ervices that are solely educational in nature" or "[t]uition for services that are school-based."  (Rec. 83, 299, 511.)

[195] (Defs.' Opp'n 17, Doc. No. 31.)

it is still the appropriate remedy because S.S.'s entitlement to benefits during that period is not clear.

United's decision based on the record before it was incorrect; S.S. is clearly entitled to benefits through May 31, 2019.[196]  As detailed above, the record contains substantial evidence detracting from—or even directly contradicting—United's findings.  And United's failure to fully consider the relevant evidence through May 2019 makes it impossible to determine whether United made a correct determination for later time periods.  United's flawed consideration of the record through May makes it unclear whether United fully and fairly reviewed later claims.  Although cases involving remand usually involve an "arbitrary and capricious" analysis, the Tenth Circuit has concluded "the underlying rationale supporting a remand versus a reinstatement of rights is applicable" on de novo review.[197]  And courts should not "function as substitute plan administrators."[198]  Against this legal backdrop, where S.S.'s entitlement to benefits after May 2019 is unclear (so as to preclude a finding that the record "clearly shows" an entitlement),[199] the court remands the determination for S.S.'s claims from June 1, 2019 through November 23, 2019, rather than directly awarding benefits for this period.  Accordingly, S.S.'s claims from June 1, 2019 through November 23, 2019 are remanded to United for renewed evaluation, consistent with this order.

---

[196] *See Niles*, 269 F. App'x at 832 ("[T]he role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision.").

[197] *Ray v. UNUM Life Ins. Co. of Am.*, 224 F. App'x 772, 780 n.3 (10th Cir. 2007) (unpublished).

[198] *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007).

[199] *See Carlile*, 988 F.3d at 1229.

b. *Claims After November 23, 2019*

Where United agrees remand is the appropriate remedy for claims made after November 23, 2019, and the record contains no medical records for that time period—making entitlement to benefits unclear—the claims are remanded.

Because Plaintiffs' last appeal was submitted on November 23, 2019, United contends they did not exhaust their administrative remedies for any denial of benefits after that date.[200] Plaintiffs argue they appealed United's denial of benefits from "January 1, 2019, onward" because, taking the denial letters together, United made clear that it "considered [Plaintiffs'] denial to be a denial for the entire period of time S.[S.] would receive treatment, however long that turned out to be."[201]  Plaintiffs also ask the court to "limit United's possible bases for denying S.[S.]'s claims" for this period of time to the rationales "already articulated in its denial letters."[202]

At the hearing, although United maintained its position as to Plaintiffs' exhaustion of remedies, United acknowledged claims after November 23, 2019 should be remanded so they can go through the administrative process.  In other words, there is no dispute that remand is appropriate for these claims.  United noted disagreement as to whether any appeal after November 23, 2019, would be timely under the plan—but recognized Plaintiffs may raise these arguments on remand.  For these reasons, the benefits determination on S.S.'s claims from November 23, 2019 forward will be remanded.  Even as to the issue of whether Plaintiffs exhausted their prelitigation appeal remedies, remand is appropriate—especially where the Tenth

---

[200] (Defs.' Opp'n 18, Doc. No. 31.)

[201] (Pls.' Reply 11–12, Doc. No. 36.)

[202] (Pls.' MSJ, 36, Doc. No 26.)

Circuit has yet to address whether exhaustion is a jurisdictional requirement in ERISA cases.[203] However, United's bases for review will not be limited to those already articulated.

Plaintiffs' request to limit United's review of claims made after November 23, 2019, to its previously articulated denial rationale is unjustified. United's post-remand review will not be limited in this manner. "When courts review a denial of coverage, they consider the 'rationales that were specifically articulated in the administrative record as the basis for denying a claim.'"[204] In its first denial letter, issued on June 7, 2019, United denied coverage from June 4, 2019 forward.[205] In its second denial letter, issued on December 26, 2019, United denied coverage through May 31, 2019.[206] In its third denial letter, issued on February 18, 2020, United denied coverage from June 4, 2019 forward.[207] The appeal record for the third denial was the most substantial, as it included medical records through November 23, 2019. Where United's denials of coverage involved only a review of records through November 23, 2019, United should not be limited to its pre-November 2019 denial rationale in its review of post-November 2019 records.

Where the administrative record contains no post-November 2019 medical records, and where the parties agree remand is warranted, remand is appropriate for claims made after November 23, 2019.

---

[203] *L.D.*, 2023 U.S. Dist. LEXIS 132717, at *39. Many other circuits have considered this issue and determined exhaustion is not a jurisdictional requirement. *See id.* (collecting cases).

[204] *Id.* at *16 (quoting *Spradley*, 686 F.3d at 1140).

[205] (Rec. 39.)

[206] (*Id.* at 693.)

[207] (*Id.* at 713.)

　　　　*c.  Prejudgment Interest and Attorneys' Fees*

An award of prejudgment interest is appropriate when it "serves to compensate the injured party and its award is otherwise equitable."[208]  ERISA provides that a court "in its discretion may allow a reasonable attorney's fee and costs of action,"[209] when a "claimant has achieved some degree of success on the merits."[210]  Because this matter is remanded to United, and considering Plaintiffs' have not yet requested such relief,[211] the court declines to consider these issues at this juncture.

<u>CONCLUSION</u>

Plaintiffs have demonstrated S.S.'s continued care at CALO was medically necessary through at least May 31, 2019, by a preponderance of the evidence.  Considering S.S. demonstrated a high rate of dysregulation putting herself and others at risk of harm through May 2019, the turbulent nature of S.S.'s family relationships through at least April 2019, the importance of a consistent and sustained therapeutic relationship in light of S.S.'s specific condition, and S.S.'s treating therapist's opinion that S.S. should continue to receive residential treatment through at least August 2019, S.S.'s continued care at CALO was medically necessary at least through May 31, 2019.  Accordingly, the court orders as follows:

---

[208] *Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002), *as amended on denial of reh'g* (June 19, 2002).

[209] 29 U.S.C. § 1132(g)(1).

[210] *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (citation and internal quotation marks omitted).

[211] (Pls.' MSJ 37, Doc. No. 26 (requesting the opportunity to brief these issues at a future time); Pls.' Opp'n 18, Doc. No. 32 (same).)

1. Plaintiffs' motion for summary judgment[212] is GRANTED.

2. Defendants' motion for summary judgment[213] is DENIED.

3. United is ORDERED to pay for S.S.'s treatment at CALO from January 1, 2019 to May 31, 2019.

4. S.S.'s claims from June 1, 2019 through November 23, 2019 are REMANDED to United Healthcare Insurance and United Behavior Health for further consideration consistent with this order.

5. Any benefits claims made after November 23, 2019 are REMANDED to United Healthcare Insurance and United Behavior Health.

DATED this 28th day of August, 2023

BY THE COURT

Daphne A. Oberg
United States Magistrate Judge

---

[212] (Doc. No. 26.)

[213] (Doc. No. 25.)